UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LEKIA MONIQUE MILLER,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

              Defendant.

_____

DECISION & ORDER

13-CV-6462P


## PRELIMINARY STATEMENT

Plaintiff Lekia Monique Miller ("Miller") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 17).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 12). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Miller's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.      Procedural Background

Miller protectively filed for SSI and DIB on June 29, 2010, alleging disability beginning on May 18, 2010, due to diabetes, mental health issues, post-traumatic stress disorder ("PTSD"), anxiety, depression, asthma, muscle spasms and an abscess under her arm. (Tr. 154-67, 197).[1]  On June 7, 2011, the Social Security Administration denied Miller's claim for benefits, finding that she was not disabled.[2]  (Tr. 81-83).  Miller requested and was granted a hearing before Administrative Law Michael W. Devlin (the "ALJ").  (Tr. 36, 108-15, 116-39). The ALJ conducted a hearing on May 8, 2012.  (Tr. 36-64).  In a decision dated August 30, 2012, the ALJ found that Miller was not disabled and was not entitled to benefits.  (Tr. 20-30).

On July 2, 2013, the Appeals Council denied Miller's request for review of the ALJ's decision.  (Tr. 1-7).  In the denial, the Appeals Council declined to consider a psychological report from Tara Russow ("Russow"), PhD, that postdates the ALJ's determination.  (Tr. 2).  Miller commenced this action on August 30, 2013 seeking review of the Commissioner's decision.  (Docket # 1).


## II.     Relevant Medical Evidence[3]

### A.      Treatment Records

#### 1.      University of Rochester – Asthma, Allergy & Pulmonary Care

Treatment notes indicate that Miller began treating with Richard J. Looney ("Looney"), MD, at the Asthma, Allergy and Pulmonary Care Department of the University of

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Miller's prior application for DIB was denied by an administrative law judge after a hearing on May 17, 2010.  (Tr. 65-69, 204).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

Rochester Medical Center ("URMC") on August 18, 2010.  (Tr. 268-70).  According to the notes, Miller had previously been diagnosed with poorly-controlled type 1 diabetes, asthma and various allergies.  (*Id.*).  Miller reported that she had recently awoken with a severe allergic reaction involving angioedema and hives on her face.  (*Id.*).  She visited the Emergency Department at Strong Memorial Hospital and was treated with Benadryl, Soul-Medrol, Prednisone and Pepcid.  (*Id.*).

Miller reported suffering from symptoms of allergic rhinoconjunctivitis, accompanied by nasal congestion, ocular pruritus, rhinorrhea and frequent throat clearing.  (*Id.*).  According to Miller, her symptoms were worse in the winter and summer.  (*Id.*).  She reported that she had begun taking Advair approximately one month earlier, which she believed was helping.  (*Id.*).  Miller stated that she had been smoking cigarettes for the previous eight years, currently smoked approximately four cigarettes a day and was trying to quit.  (*Id.*).

Looney assessed that Miller suffered from poorly-controlled type 1 diabetes, asthma, symptoms of seasonal and perennial allergic rhinitis and various allergies.  (*Id.*).  Based upon the results of a spirometry, Looney opined that Miller's asthma was under improved control with her current medication regimen.  (*Id.*).  Looney recommended that she take Advair HFA instead of Advair Diskus for her asthma and recommended that she continue taking Loratadine for her allergic rhinoconjunctivitis.  (*Id.*).

Miller returned for an appointment with Looney on October 27, 2010. (Tr. 265-67).  During the appointment, Miller reported that she was doing well and was pregnant. (*Id.*).  Given her pregnancy, Miller was advised to defer allergy skin testing.  (*Id.*).  According to Looney, Miller's asthma was well-controlled, but her allergic rhinitis was slightly less

controlled.  (*Id.*).  Looney recommended that Miller begin taking Cetirizine and Budesonide. (*Id.*).

### 2.        URMC - Endocrine and Metabolism Unit

Treatment records indicate that Miller began receiving treatment from Jacquelyn Doyle ("Doyle"), a nurse practitioner in URMC's Endocrine and Metabolism Department. (Tr. 412-14).  The treatment records suggest that John Grable ("Grable"), MD, was Miller's primary care physician and that he reviewed the treatment records.  (*Id.*).

During the June 28, 2011 visit, Miller complained of decreased appetite, weight loss, recurrent hidradenitis supperativa, depression, anxiety, heartburn and diarrhea caused by antibiotics.  (*Id.*).  She did not bring a blood glucose diary to the appointment, but reported that her levels were generally above 200 mg/dL.  (*Id.*).  Miller denied experiencing vision problems and reported feeling numbness and tingling in her fingers and toes.  (*Id.*).  Doyle performed a monofilament wire test of her feet, which was normal, and Doyle noted no lesions or deformities in her feet.  (*Id.*).  Doyle recommended increasing her dosage of prescribed Lantus.  (*Id.*).

On July 28, 2011, Miller returned for a follow-up appointment with Doyle. (Tr. 415-16).  During the appointment, she complained of vision problems and poor appetite. (*Id.*).  Miller reported that she planned to attend school in the fall.  (*Id.*).  She denied experiencing any numbness or tingling in her fingers and toes.  (*Id.*).  Doyle reviewed Miller's blood glucose diary and noted that her levels were generally above 200 mg/dL, indicating an inadequate basal insulin.  (*Id.*).  Doyle increased the dosage of Lantus and Novolog and recommended that Miller see an ophthalmologist.  (*Id.*).

On October 12, 2011, Miller returned for an "urgent visit" at the request of Eastman Dental because she needed to have her wisdom teeth removed, but her diabetes

remained uncontrolled.  (Tr. 417-19).  During the visit, she reported continued blurry vision, but denied experiencing any numbness or tingling in her fingers or toes.  (*Id.*).  Again, a monofilament wire test was within normal limits.  (*Id.*).  Doyle indicated that Miller was not checking her blood glucose levels frequently enough.  (*Id.*).  Doyle increased her Lantus dosage and prescribed Ibuprofen.  (*Id.*).

Miller returned for another appointment on May 3, 2012.  (Tr. 648-50).  She denied vision problems or numbness or tingling in her fingers or toes.  (*Id.*).  The treatment notes indicate that Miller had recently been seen by an ophthalmologist.  (*Id.*).  Doyle noted that a monofilament test of her feet was within normal limits.  (*Id.*).  According to Doyle, Miller forgot to bring her blood glucose diary, but reported that her levels were generally 150 mg/DL or higher.  (*Id.*).  Doyle increased her Lantus and Novolog dosages.  (*Id.*).

### 3.    Evelyn Brandon Mental Health Center

Treatment notes from Evelyn Brandon Mental Health Center ("EBMHC") indicate that on August 11, 2009, Miller was evaluated by Kevin McIntyre ("McIntyre"), MD. (Tr. 279-84).  According to the notes, Miller had been receiving therapy services at EBMHC the previous year and had been receiving prescriptions from her primary care physician.  (*Id.*).  She reported several childhood traumas, including a house fire when she was eleven.  (*Id.*). According to Miller, her thirteen-year-old brother died in the fire.  (*Id.*).  She also reported attempted sexual abuse by relatives.  (*Id.*).  Miller indicated that she had graduated high school on the honor roll and did not associate with her family.  (*Id.*).  She complained of poor sleep, anxiety accompanied by crying and hand sweating, irritability, frustration and poor appetite. (*Id.*).  Miller reported that she used marijuana daily.  (*Id.*).  Upon examination, she demonstrated

unremarkable behavior, motor movements, speech, thought form and cognition, an anxious mood, constricted affect, superficial insight and fair judgment.  (*Id.*).

McIntyre diagnosed Miller with anxiety disorder, rule out PTSD.  (*Id.*).  He discouraged her marijuana use over concerns that it could perpetuate her poor copings skills and depressive symptoms and interfere with treatment.  (*Id.*).  McIntyre prescribed Paxil and Trazodone.  (*Id.*).

During May and June 2010, Miller failed to attend two scheduled appointments. (Tr. 429-38).  During that same time period, she attended one appointment with Kathryn Rotolo ("Rotolo"), MS MHC, her therapist, and one appointment with Alexandra M. Fotiou ("Fotiou"), a psychiatrist who was managing Miller's medication regimen.  (*Id.*).  Rotolo indicated that Miller had not significantly engaged in treatment, noting that she had not been seen since April 2010.  (*Id.*).  Additionally, Rotolo suggested that Miller attend chemical dependency treatment and cautioned that her case would be closed if she failed to do so.  (*Id.*).

During her appointments, Miller expressed difficulty working due to her medical problems and feelings of disappointment.  (*Id.*).  She also indicated that she had been denied SSI/DIB benefits.  (*Id.*).  Miller also reported that she believed that the Prozac was helping to relieve her symptoms, although she continued to feel irritable.  (*Id.*).  Upon examination by Rotolo, Miller presented unremarkable characteristics.  (*Id.*).  Fotiou increased her Prozac dosage and prescribed Seroquel.  (*Id.*).  Miller requested reassignment to a new therapist.  (*Id.*).

During July 2010, Miller attended one appointment with Rotolo and one appointment with Fotiou and a nurse, Susan Barrett ("Barrett").  (Tr. 439-52).  During her appointment with Rotolo, Miller reported that she wanted to work with an older therapist.  (*Id.*).

Rotolo observed that Miller demonstrated unremarkable characteristics and noted that she expressed grief over the loss of children in her life.  (*Id.*).

Miller reported continued disrupted sleep, poor appetite and fluctuating energy levels.  (*Id.*).  She also reported that she was experiencing increased irritability and anxiety and that she tended to isolate herself in her apartment.  (*Id.*).  According to Miller, her boyfriend was incarcerated.  (*Id.*).  She reported that she had decreased the level of her marijuana use from ten "blunts" a day to three.  (*Id.*).  Miller reported that she was doing "a little bit better" and was sleeping better, but continued to experience panic attacks.  (*Id.*).  Fotiou increased her Prozac dosage, discontinued Seroquel and prescribed Seroquel XR.  (*Id.*).

Miller missed two appointments with her new therapist, Noel Calvo ("Calvo"), during July and August 2010.  (Tr. 451-52).  She met with Calvo for the first time on August 16, 2010.  (Tr. 453-55).  Calvo described her as "engaging and cooperative" and noted that she demonstrated a euthymic mood.  (*Id.*).  Miller informed Calvo that she had recently begun a job as a bartender and was interested in becoming a bookkeeper or going to school for cosmetology, culinary arts or accounting.  (*Id.*).  She reported that her boyfriend had recently been released from jail.  (*Id.*).  She also reported that she was experiencing anxiety, panic attacks and difficulty falling asleep.  (*Id.*).  She indicated that she tends to isolate herself and does not trust people. (*Id.*).

On August 25, 2010, Miller attended an appointment with Nurse Tara Avery ("Avery") and Fotiou to evaluate her medication regimen.  (Tr. 456-64).  She reported that her mood and anxiety had improved with the increased Prozac dosage, but that she felt the dosage was still not correct due to her continued irritability.  (*Id.*).  She stated that she was working

part-time as a bartender, which kept her busy and improved her mood.  (*Id.*).  Fotiou declined to

modify her medication regimen due to a recent allergic reaction she had experienced.  (*Id.*).

       During September 2010, Miller failed to attend four scheduled appointments.

(Tr. 470-73).  On September 2, 2010, Calvo reviewed Miller's progress.  (Tr. 465-69).  Calvo

reported that she had seen her only once.  (*Id.*).  According to Calvo, beginning in October,

Miller would have to discontinue all of her medication (except for her insulin) in order to

undergo allergy testing.  (*Id.*).  Calvo noted that Miller had reported that she felt her anxiety and

mood had improved while on Prozac, although she continued to experience irritability.  (*Id.*).  On

September 22, 2010, Miller attended an appointment with Calvo and reported that she was

pregnant.  (Tr. 474-80).  She reported that her attitude was improved and she did not get

frustrated or angry as easily.  (*Id.*).  Miller expressed some concern regarding her ability to

maintain the pregnancy during her first trimester due to her history of miscarriage.  (*Id.*).  She

reported that she had discontinued her medications due to her pregnancy, but had not

experienced any negative response.  (*Id.*).  Calvo noted that Miller's mood was euthymic and that

she demonstrated a full range affect.  (*Id.*).

       On October 5, 2010, Miller attended another therapy session with Calvo.

(Tr. 481-86).  She reported that she was not feeling "normal" and was easily hurt and angered.

(*Id.*).  Miller attributed her feelings to her pregnancy and being off her medication.  (*Id.*).

According to Miller, she generally had been staying home except to go to work.  (*Id.*).  She

explained that she does not like to be around others when she is feeling negative.  (*Id.*).  Calvo

noted that Miller's mood was euthymic and that she demonstrated a normal range affect.  (*Id.*).

Miller failed to attend all other scheduled appointments in October and November 2010.

(Tr. 487-89).

Miller failed to attend two scheduled appointments during December 2010 and January 2011.  (Tr. 494, 498).  On December 9, 2010, Miller met with Calvo and reported that she was four months pregnant and had stopped working in October due to stress.  (Tr. 495-97).  According to Miller, she spent her time attending doctor's appointments and spending time with her family.  (*Id.*).  She reported that her boyfriend was re-incarcerated due to a parole violation.  (*Id.*).  On January 24, 2011, Miller returned for another therapy session with Calvo.  (Tr. 499-501).  She reported increased irritability and difficulties with her pregnancy.  (*Id.*).  According to Miller, her boyfriend's brother had moved into her residence after his release from prison because he had nowhere else to stay.  (*Id.*).  Miller reported feeling tired and unmotivated.  (*Id.*).  Calvo noted that she presented with an irritable mood and a normal range affect.  (*Id.*).

On February 21, 2011, Calvo reviewed Miller's progress.  (Tr. 502-03).  Calvo noted that her attendance was sporadic and observed that she had demonstrated positive results while on Prozac, although she had had to discontinue the medication due to her pregnancy, which had resulted in increased moodiness.  (*Id.*).  Calvo reported that Miller had been working for several months as a bartender, but quit that job as she progressed in her pregnancy.  (*Id.*).

On that same date, Miller attended a therapy session with Calvo.  (Tr. 506-09).  During the appointment, she reported ongoing moodiness, irritability and stress related to her boyfriend's incarceration and his brother's continued presence in her residence.  (*Id.*).

On March 21, 2011, Miller notified Calvo that she was in the hospital with premature labor.  (Tr. 510).  She indicated that she would continue treatment once she and her baby were discharged from the hospital.  (Tr. 514).

Treatment notes indicate that Miller failed to attend scheduled appointments on June 9, 2011, July 13, 2011, August 23, 2011 and September 9, 2011.  (Tr. 515-16, 521-22).  On September 9, 2011, she was discharged from care for failing to attend appointments.  (*Id.*).

B.    **Medical Opinion Evidence**

1.    **Harbinder Toor, MD**

On May 23, 2011, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination.  (Tr. 363-66).  Miller reported that she had been diagnosed with diabetes and high blood pressure.  (*Id.*).  She also reported a left knee injury that caused dull, achy, intermittent pain.  (*Id.*).  Miller reported that dust, cold and heat aggravate her asthma.  (*Id.*).  According to Miller, she previously smoked cigarettes and marijuana, but quit both in 2010.  (*Id.*).  She reported that she cooks five days a week, cleans seven days a week, does laundry twice a week and shops twice a month.  (*Id.*).  She cares for a child daily and is able to perform her own personal hygiene.  (*Id.*).  She watches television and leaves the house, but does not socialize.  (*Id.*).

Upon examination, Toor noted that Miller was not in acute distress and had a normal gait, could perform the heel and toe walk and could fully squat.  (*Id.*).  She used no assistive devices and had no difficulty getting on and off the exam table, rising from the chair and changing for the exam.  (*Id.*).

Toor noted that her cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Toor identified no scoliosis, kyphosis or abnormality in her thoracic spine.  (*Id.*).  Toor found that Miller's lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Toor found full range of motion in her shoulders, elbows, forearms and wrists bilaterally.  (*Id.*).  He

also found full range of motion in her hips, knees and ankles bilaterally.  (*Id.*).  Toor assessed

strength as five out of five in the upper and lower extremities with no sensory deficits or atrophy

evident.  (*Id.*).  Toor found her hand and finger dexterity to be intact and her grip strength to be

five out of five bilaterally.  (*Id.*).

Toor diagnosed Miller with a history of diabetes, hypertension, anxiety,

depression and asthma.  (*Id.*).  He opined that she should avoid asthma-inducing irritants.  (*Id.*).

According to Toor, no other medical limitations were suggested by his evaluation.  (*Id.*).

## 2.    <u>Christine Ransom, PhD</u>

On May 23, 2011, state examiner Christine Ransom ("Ransom"), PhD, conducted

a consultative psychiatric evaluation of Miller.  (Tr. 367-71).  Miller reported that she took a bus

to the examination.  (*Id.*).  She also reported that she had completed high school in regular

education.  (*Id.*).  According to Miller, she had not been able to hold a job due to uncontrolled

blood glucose levels.  (*Id.*).  She reported that she resided with her two-month-old child.  (*Id.*).

According to Miller, she had received counseling at EBMHC since 2007 and had

been prescribed medications since 2009, which she stopped taking in 2010 because of her

pregnancy.  (*Id.*).  At the time of the evaluation, she had not been re-evaluated for medication.

(*Id.*).  Miller reported that she experienced mood fluctuations, poor sleep and appetite, and

frequent crying spells.  (*Id.*).  According to Miller, she angers easily and does not like to be

around other people.  (*Id.*).  She reported that she spent most of her time isolated in her room

with her infant.  (*Id.*).  She reported good energy and concentration and denied generalized

anxiety, panic attacks, manic symptomology, thought disorder or cognitive symptoms or deficits.

(*Id.*).

According to Miller, she is able to care for her personal hygiene, prepare meals, clean, do laundry, manage her money and shop. (*Id.*). She is able to take public transportation, but sometimes has to get off due to agitation. (*Id.*). Miller does not like to be around friends or family and spends most of her day with her infant. (*Id.*).

Upon examination, Ransom noted that Miller appeared neatly dressed with adequate hygiene and grooming and with hyperactive and restless motor behavior. (*Id.*). Ransom opined that Miller had fluent and intelligible speech, with adequate language, coherent and goal-directed thought processes, moderately dysphoric, moderately labile and moderately intense mood and affect, clear sensorium, full orientation, adequate insight, adequate judgment and average intellectual functioning with an appropriate general fund of information. (*Id.*). Ransom noted that Miller's attention and concentration were intact. (*Id.*). According to Ransom, Miller could count backwards and perform simple calculations and perform serials threes without error. (*Id.*). Her immediate and recent memory skills were intact. (*Id.*). According to Ransom, she could recall three objects immediately and three out of three objects after five minutes, and could complete five digits forward and three digits backward. (*Id.*).

Ransom diagnosed Miller with bipolar disorder, currently moderate to marked, anxiety disorder, not otherwise specified, currently moderate, and marijuana dependence, currently in remission. (*Id.*). According to Ransom, Miller could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule and learn simple new tasks. (*Id.*). Ransom opined that Miller's bipolar and anxiety disorders would cause her to have moderate to marked difficulties performing complex tasks, relating adequately with others and appropriately dealing with stress. (*Id.*). According to Ransom, her prognosis was good with

continued treatment and the addition of medication to address her mental health difficulties. (*Id.*).

### 3.   L. Meade, Psychology

On June 2, 2011, agency medical consultant Dr. L. Meade ("Meade") completed a Psychiatric Review Technique. (Tr. 372-85). Meade concluded that Miller's mental impairments did not meet or equal a listed impairment. (Tr. 372, 375, 377, 381). According to Meade, Miller suffered from no limitations in her activities of daily living and from moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace. (Tr. 382). According to Meade, Miller had not suffered repeated episodes of deterioration. (*Id.*). Meade completed a mental Residual Functional Capacity ("RFC") assessment. (Tr. 400-03). Meade opined that Miller suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to change in the work setting, and set realistic goals or make plans independently of others. (Tr. 400-01). According to Meade, she was able to perform the basic demands of unskilled and semi-skilled work, but not in close contact with others. (Tr. 402).

### 4.   Doyle

On November 29, 2011, Doyle wrote a letter indicating that she had treated Miller for her diabetes. (Tr. 427). Doyle opined that Miller was able to work part-time, provided that

she was able to take a break every three hours to check her blood glucose level, take insulin and

eat as needed.  (*Id.*).

     **5.**      **Tara Russow, PhD**

     On March 13, 2013, after the date of the ALJ's decision, Russow conducted a

comprehensive evaluation of Miller's intellectual and personality functioning upon a referral

from a vocational rehabilitation program.  (Tr. 652-56).  During the evaluation, Miller recounted

her educational history and indicated that she had received a certification in cosmetology from

the Continental School of Beauty in July 2012 and that she planned to obtain a certification in

esthetics the following month.  (*Id.*).

     Miller also recounted her work history and indicated that her last employment was

as a janitor in October 2007.  (*Id.*).  According to Miller, she stopped working due to her

diabetes.  (*Id.*).  She reported that she continued to smoke cigarettes and use marijuana on the

weekends.  (*Id.*).  Russow reviewed records from EBMHC showing that Miller had received

mental health treatment between April 2008 and November 2011.  (*Id.*).

     Miller reported four miscarriages and the death of a child on the day he was born.

(*Id.*).  Miller indicated that she no longer experienced full symptoms of PTSD, but did

experience frequent waking, nightmares and generalized anxiety.  (*Id.*).  Additionally, Miller

reported depressive symptoms, including rumination, decreased appetite, diminished motivation

and low energy.  (*Id.*).

     Upon examination, Russow noted that Miller appeared neatly dressed, with good

eye contact, full orientation, alert and cooperative demeanor, fluid and goal-directed speech,

logical and organized thought processes, a mildly dysphoric and anxious mood and a full range

affect.  (*Id.*).  Miller demonstrated a Full Scale Intelligence Quotient of 89, which placed her in

the low average range of intelligence.  (*Id.*).  Russow diagnosed Miller with anxiety disorder, not

otherwise specified, depressive disorder, not otherwise specified, and cannabis abuse.  (*Id.*).

With respect to her vocational goals, Russow noted that Miller appeared to enjoy

her current training and was interested in working as a cosmetologist and esthetician.  (*Id.*).

According to Russow, Miller's employment should allow her to adjust her hours and manage her

physical needs appropriately.  (*Id.*).  Russow indicated that frequent breaks, tasks of limited

duration, adequate rest and careful regulation of diet and medications are considerations that

Miller should discuss with her physician and potential employers.  (*Id.*).

III.    **Non-Medical Evidence**

In her application for benefits, Miller reported that she was born in 1983.

(Tr. 127).  She reported that she had completed the twelfth grade in a regular class setting and

had previously been employed as a cashier, customer service representative, janitor, waitress and

fast food restaurant employee.  (Tr. 198, 207).

Miller reported that she lives in an apartment with her one-month-old daughter.

(Tr. 222-23).  According to Miller, she can attend to the personal hygiene needs of her daughter

and herself and can prepare meals daily.  (Tr. 223-24).  Miller reported that she is able to

complete household chores, including cleaning, laundry, ironing, taking out the garbage and

shopping, although she needs assistance with the laundry, garbage and shopping.  (Tr. 225).

According to Miller, she is unable to perform yard work because it causes her blood glucose

levels to drop.  (*Id.*).  She is able to leave her residence every other day without assistance and

walks or uses public transportation.  (*Id.*).  According to Miller, she does not have a driver's

license.  (Tr. 226).  She reported that she goes grocery shopping approximately three times a

month for three hours at a time.  (*Id.*).

Miller indicated that she enjoys reading, exercising, walking and watching

television.  (*Id.*).  According to Miller, she cannot walk or otherwise exercise for more than one

hour at a time because her blood glucose level will drop.  (Tr. 227).  Miller does not socialize

with others and generally spends her time alone in her apartment.  (*Id.*).  According to Miller, her

medical conditions limit her ability to walk and climb stairs.  (Tr. 228).  She estimated that she

could walk approximately six blocks before needing to rest for approximately an hour.  (Tr. 229).

In addition, Miller reported that she did not have any problems paying attention, following

instructions, remembering things or getting along with people in authority positions.  (*Id.*).

According to Miller, she has difficulty dealing with stress and changes in schedules.  (Tr. 230).

Miller reported that she suffers from anxiety, which is triggered by sitting for too

long, seeing people with their children, and certain memories.  (Tr. 231).  According to Miller,

her anxiety is characterized by sweating, rapid heartbeat, fear and nervousness.  (*Id.*).  She

reported that she experiences daily anxiety for approximately two hours at a time.  (Tr. 232).

Miller reported that she is able to continue to do things during an attack and is usually "ok" once

her symptoms diminish.  (*Id.*).

During the administrative hearing, Miller testified that she lived in an apartment

with her daughter.  (Tr. 40-41).  According to Miller, she attended classes at the Continental

School of Beauty approximately thirty-two hours each week.  (Tr. 41).  Miller testified that the

school accommodated her need to test her blood glucose level every three hours.  (*Id.*).

According to Miller, she generally needs twenty to thirty minutes to test her blood glucose level

and administer insulin or eat in order to regulate her level.  (Tr. 41-42).  She testified that

approximately twice a week she experiences seizures, sweating and leg weakness with low blood glucose levels. (*Id.*). She also testified that she feels sick and gets a headache when her blood glucose levels are high. (Tr. 48-49).

Miller testified that she was last employed as a janitor and held that job for a short period of time before she was diagnosed with diabetes and hospitalized. (Tr. 43). Prior to that, she worked as a customer service representative, but was terminated after being absent as a result of eye surgery. (Tr. 45-46). She was also previously employed in another customer service position, but she left that position to return to school. (Tr. 47-48).

According to Miller, her diabetes prevents her from working because she needs to be able to take breaks in order to monitor and manage her blood glucose levels. (Tr. 48). She testified that she has been hospitalized on three occasions due to her diabetes. (Tr. 49). In addition to diabetes, Miller testified that she suffers from asthma, allergies, cysts and bleeding in her eye. (Tr. 49-53). According to Miller, her asthma, the severity of which varies with the weather, had not been a problem during the current year. (Tr. 50). Miller testified that she was recently diagnosed with bleeding in her right eye, which caused blurriness. (Tr. 52-53).

Miller also testified that she suffers from stress and anxiety. (Tr. 54). According to Miller, she previously received treatment at EBMHC, but discontinued treatment after becoming pregnant with her daughter. (Tr. 54-56). She testified that mental health treatment was helping her, although she had not returned for treatment at EBMHC after her daughter was born because she was frequently assigned to new therapists. (Tr. 55-56). Miller testified that she was waiting for a referral for treatment with a different provider. (*Id.*).

According to Miller, she experiences crying spells and sometimes has outbursts at school. (Tr. 56). Additionally, she has difficulty dealing with other people, particularly

strangers.  (*Id.*).  According to Miller, she works better alone.  (*Id.*).  She testified that she was

more willing to work with other people when she was on medication.  (*Id.*).

Vocational expert, Julie Andrews ("Andrews"), also testified during the hearing.

(Tr. 59-64).  The ALJ first asked Andrews to characterize Miller's previous employment.

(Tr. 59-60).  According to Andrews, Miller had been employed as a receptionist and an order

clerk.  (*Id.*).

The ALJ then asked Andrews whether a person would be able to perform any of

the work that Miller had previously performed who was the same age as Miller, with the same

education and vocational profile, who could frequently perform tasks requiring near visual acuity

and who was able to understand, remember and carry out only simple instructions and tasks, and

maintain concentration and focus for up to two hours, but who must avoid exposure to

respiratory irritants, could only have occasional interaction with coworkers and supervisors,

rarely work in conjunction with coworkers and have occasional contact with the general public,

and must be permitted to take a break every three hours for approximately twenty to thirty

minutes.  (Tr. 60-61).  Andrews testified that such an individual would be unable to perform the

previously-identified positions, but would be able to perform other positions in the national

economy, including small products assembler and industrial cleaner.  (Tr. 61).  Both of these

positions, Andrews testified, were unskilled and performed at the light or medium exertion level.

(*Id.*).  The ALJ then asked Andrews whether jobs would exist for the same individual with the

same limitations, except that the individual was only able to stand or walk for up to two hours

and sit for six hours during an eight-hour workday.  (Tr. 61-62).  Andrews testified that such an

individual could not perform the previously-identified positions, but could perform other

positions in the national and regional economy, including the positions of preparer and brake

linings coater.  (*Id.*).  Miller's attorney then asked Andrews whether her answers would change if she assumed the same limitations, except that the individual could only rarely have contact with the general public.  (Tr. 62-63).  Andrews testified that her answers would not change with those assumptions.  (*Id.*).  Miller's attorney then asked Andrews to assume the same limitations along with the added limitation of being off-task approximately twenty percent of the time.  (*Id.*).  Andrews opined that such an individual would not be able to maintain employment on a full-time, competitive basis.  (*Id.*).

## DISCUSSION

### I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

20

  (3)  if so, whether any of the claimant's severe impairments
meets or equals one of the impairments listed in Appendix
1 of Subpart P of Part 404 of the relevant regulations;

  (4)  if not, whether despite the claimant's severe impairments,
the claimant retains the residual functional capacity to
perform his past work; and

  (5)  if not, whether the claimant retains the residual functional
capacity to perform any other work that exists in significant
numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

  A.  **The ALJ's Decision**

    In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 20-30).  Under step one of the process, the ALJ found that Miller has not

engaged in substantial gainful activity since May 18, 2010, the alleged onset date.  (Tr. 22).  At

step two, the ALJ concluded that Miller has the severe impairments of type 1 diabetes, asthma,

right eye vision impairment, bipolar disorder, depressive disorder, anxiety disorder and PTSD.

(*Id.*).  The ALJ concluded that Miller's hypertension, kidney disease and drug use were not

severe.  (Tr. 23).  At step three, the ALJ determined that Miller does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.

(Tr. 23-24).  With respect to Miller's mental impairments, the ALJ found that Miller suffers from

moderate difficulties in maintaining concentration, persistence or pace, and social functioning,

and mild difficulties in performing activities of daily living.  (Tr. 23).  The ALJ concluded that

Miller has the RFC to understand, remember and follow simple instructions and tasks and maintain concentration and focus for up to two hours at a time and to perform work at all exertional levels, but that she must be permitted to take a break of twenty to thirty minutes every three hours, can only frequently perform tasks requiring near visual acuity, must avoid exposure to respiratory irritants and can only occasionally interact with coworkers and supervisors or have contact with the general public, and can rarely work in conjunction with coworkers.  (Tr. 24-28). At step four and five, the ALJ determined that Miller was unable to perform her prior work, but that other jobs existed in the national and regional economy that she could perform, including the positions of brake linings coater, small products assembler and industrial cleaner.  (Tr. 28-29). Accordingly, the ALJ found that Miller is not disabled.  (*Id.*).

  **B.**  **Miller's Contentions**

    Miller argues that the ALJ's determination that she is not disabled is not supported by substantial evidence and is the product of legal error.  (Docket # 11-1).  First, she contends that the Appeals Council erred by failing to properly consider Russow's opinion submitted on appeal.  (Docket ## 11-1 at 11-14, 13 at 9-10).  Next, Miller challenges the ALJ's RFC assessment on the grounds that he failed to give appropriate weight to the opinions of Miller's treating physicians and that the RFC analysis is not otherwise supported by substantial evidence.  (Docket ## 11-1 at 14-23, 13 at 1-7).  Miller also challenges the ALJ's mental RFC assessment on the grounds that it failed to account for the moderate limitations assessed at step three and on the grounds that the ALJ failed to develop the record.  (Docket # 11-1 at 24-27). She also maintains that ALJ failed to properly assess her credibility.  (Docket ## 11-1 at 27-30, 13 at 7-8).  Finally, Miller contends that the ALJ's step five determination is not based upon

substantial evidence because the hypothetical posed to the vocational expert was based upon a flawed RFC analysis.  (Docket # 13 at 8-9).

## II.   Analysis

### A.   New Evidence Submitted to the Appeals Council

Miller contends that the Appeals Council erred by failing to properly consider Russow's opinion submitted in connection with her appeal.  (Docket ## 11-1 at 11-14, 13 at 9-10).  Alternatively, Miller argues that the Commissioner should have ordered a new state agency opinion because Meade conducted the assessment before Russow issued her opinion. (Docket # 13 at 4).

The regulations require the Appeals Council to consider "new and material" evidence if "it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b), 416.1470(b); *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010).  If "the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence."  *Perez v. Chater*, 77 F.3d at 45 (internal quotation omitted).  The newly-submitted evidence then becomes part of the administrative record and is subject to review.  *See id.*  "The role of the district court is to review whether the Appeals Council's action was in conformity with [the]

regulations." *Ahearn v. Astrue*, 2010 WL 653712, *4 (N.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000)).

To require consideration by the Appeals Council, the evidence must be both "(1) new and not 'merely cumulative of what is already in the record' and (2) material, meaning 'both relevant to the claimant's condition during the time period for which benefits were denied and probative.'" *Shields v. Astrue*, 2012 WL 1865505, *2 (E.D.N.Y. 2012) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  To be material, there must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Jones v. Sullivan*, 949 F.2d at 60.  "If the Appeals Council fails to consider new, material evidence, 'the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence.'" *Ahearn v. Astrue*, 2010 WL 653712 at *4 (quoting *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009)).  The mere fact that the evidence was generated after the ALJ rendered his decision does not necessarily mean that the evidence is not relevant to the disability evaluation.  *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004).

I find that the Appeals Council did not err.  As an initial matter, Russow's opinion is based upon an evaluation of Miller that occurred almost six months after the ALJ rendered his decision.  Nothing in the report suggests that Russow had ever met, treated or evaluated Miller during the relevant time period.  Further, although Russow recounted some of Miller's treatment records from the relevant period, nothing in the report suggests that Russow provided a retroactive opinion or opined that Miller's impairments were more significant than previously diagnosed.  *Cf. Martinez v. Barnhart*, 262 F. Supp. 2d 40, 47-48 (W.D.N.Y. 2003) (recognizing that under certain circumstances a retrospective opinion of a treating physician is entitled to

24

weight and should be evaluated by the ALJ). Rather, Russow provided an opinion regarding

Miller's current functioning and did not purport to offer any opinion as to Miller's functional

capacity during the relevant time period. *See Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y.

1999) ("[w]hile the existence of a pre-existing disability can be proven by a retrospective

opinion, such an opinion must refer clearly to the relevant period of disability and not simply

express an opinion as to the claimant's current status"). Under these circumstances, I conclude

that Russow's opinion is not "material" because it does not clearly relate to Miller's condition

during the relevant time period. *See Phoenix v. Colvin*, 2015 WL 451016, *23 (S.D.N.Y. 2015)

("[a]n opinion from a physician who did not provide treatment during the period in question is

not relevant to determining a claimant's disability unless it reveals that the claimant's condition

was far more serious than previously thought"); *Lesterhuis v. Colvin*, 2014 WL 5304950, *9

(W.D.N.Y. 2014) (Appeals Council properly declined to disturb ALJ determination based upon

medical opinion provided by physician who began treating claimant just prior to the

administrative hearing; "if the physician treated the claimant after the retrospective time period,

and the contemporaneous medical evidence does not support or even contradicts the physician's

opinion, then that physician's opinion may not be probative"); *Florek v. Comm'r of Soc. Sec.*,

2009 WL 3486643, *11 (N.D.N.Y. 2009) (psychological evaluation conducted after ALJ's

decision was not material because it "post-date[s] the ALJ's decision by nearly eleven months

and [did] not relate to the period on or before the date of the ALJ's decision . . . [and] did not

reveal that plaintiff's impairment was substantially more severe than previously diagnosed"); *Xu

v. Barnhart*, 2006 WL 559263, *7 (E.D.N.Y. 2006) ("[a] diagnosis that post-dates an

administrative hearing may be considered new evidence relating to the relevant time period only

if it reveals that a claimant 'had an impairment substantially more severe than was previously

25

diagnosed'") (quoting *Lisa v. Sec. of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991)).

In any event, I conclude that there is not a reasonable possibility that Russow's opinion would have altered the ALJ's decision.  Russow suggested that Miller may need flexibility in her employment in order to permit her to manage her physical needs, such as, frequent breaks, rest and tasks of limited duration.  (Tr. 656).  Miller argues that this opinion is inconsistent with the conclusion that she can perform "the basic requirements of competitive work."  (Docket # 11-1 at 13).  Nothing in Russow's report, however, suggests that she believed Miller was unable to work.  To the contrary, Russow's report specifically contemplated that Miller would be employed in the future.  (Tr. 656 ("Miller seems to enjoy her current training and is interested in working")).  Indeed, the sentence cited by Miller begins with the phrase "[f]or future employment," thus undermining the suggestion that Russow believed that Miller was incapable of meeting basic work requirements.

Miller also contends that the limitations contemplated by Russow, which include frequent breaks and tasks of limited duration, are inconsistent with the ALJ's RFC assessments.  I disagree and conclude that the ALJ's RFC accommodates Miller's need for breaks and her concentration limitations.  Specifically, Russow noted that Miller would need frequent breaks in order to manage her physical needs.  The ALJ, consistent with Miller's testimony and Doyle's opinion concerning her need for breaks, incorporated into the RFC a requirement that Miller be permitted a break every three hours in order to monitor and manage her blood glucose levels. (Tr. 24).  The vocational expert testified that such a limitation would not preclude Miller from competitive employment.  (Tr. 60-61).  Similarly, the ALJ accounted for Miller's concentration limitations by limiting her to employment that required her to maintain attention and

concentration for only up to two hours at a time.  *See Buscemi v. Colvin*, 2014 WL 4772567, *14

(W.D.N.Y. 2014) ("the ALJ specifically incorporated [moderate attention and concentration

limitation] into his RFC assessment by incorporating the limitation that [claimant] could only

sustain attention and concentration for up to two hours at a time").

 Nothing in Russow's opinion conflicts with Meade's opinion or the ALJ's

determination.  Thus, even if the records could be said to constitute new evidence, they are not

material because there is no reasonable possibility that they would have altered the ALJ's

determination.  *See Ferguson v. Astrue*, 2013 WL 639308, *4 (N.D.N.Y. 2013) (remand not

required where "the opinions and diagnoses offered by both the therapists and psychiatrist [did]

not contradict any of the ALJ's findings" and where "[t]he new evidence [was] clearly not

probative and, even if received prior to the decision of the ALJ, would not have influenced the

decision"); *Duross v. Comm'r of Soc. Sec.*, 2008 WL 4239791, *4 (N.D.N.Y. 2008) (the new

evidence "is not material because there is no reasonable possibility that it would have influenced

the Commissioner to decide [plaintiff's] application differently").  Finally, I reject Miller's

suggestion that the Appeals Council erred by failing to assign a specific weight to Russow's

opinion.  (*See* Docket # 13 at 10).  *See Ferguson v. Astrue*, 2013 WL 639308 at *4 ("[i]n light of

the fact that the records were not material, the Appeals Council was not obligated to provide a

written explanation of what weight it accorded to the new evidence").

 **B.** **RFC Assessment**

 I turn next to Miller's contention that the ALJ's RFC assessment was flawed.

According to Miller, the ALJ erred by discounting the "opinion" provided by Doyle.  (Docket

## 11 at 16-18, 13 at 5-6).  An individual's RFC is her "maximum remaining ability to do

sustained work activities in an ordinary work setting on a continuing basis."  *Melville v. Apfel,*

198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an

RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d

Cir. 2010).

   As an initial matter, I am not convinced that Doyle's letter may properly be

characterized as a medical "opinion" regarding Miller's disability.  The context in which the

letter was drafted is not evident; for example, it is not apparent whether Doyle was asked to

provide an opinion as to whether Miller could work on a full-time, rather than a part-time basis.

In other words, her letter stating that Miller could work part-time does not necessarily amount to

an opinion that Miller could not work full-time. *See Wearen v. Colvin*, 2015 WL 1038236, *14

(W.D.N.Y. 2015) ([the physician] was asked only whether she believed [claimant] could work

nineteen hours per week[;] [h]er affirmative response to that question does not constitute an

opinion that [claimant] could only work part-time").

   Additionally, I conclude that Doyle's statement, which did not identify any

specific limitations arising from Miller's diabetes, amounts to a conclusion reserved for the

Commissioner.  As such, the ALJ was not obligated to accord it significant weight. *See Osbelt v.

Colvin*, 2015 WL 344541, *3 (W.D.N.Y. 2015) (physician's letter "which concluded that

'[claimant] is unable to work in any significant capacity given ongoing emotional and physical

limitations' . . . [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work," and thus constituted a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted); *Wilferth v. Colvin*, 2014 WL 4924117, *3 (W.D.N.Y. 2014) ("[the doctor's] opinion . . . does not specify any particular limitation on plaintiff's capacity: it is no more than a conclusory opinion on the ultimate issue of disability, which is unquestionably a matter reserved to the Commissioner") (internal quotation omitted); *Thompson v. Colvin*, 2014 WL 7140575, *9 (D. Vt. 2014) (doctor's opinion that claimant was currently unable to work was not entitled to weight; "the opinions are conclusory and do not list any practical functional consequences of [claimant's] mental impairments, stating merely that 'complications with anxiety, PTSD[,] and agoraphobia' have cause her to be unable to work"); *Emery v. Astrue*, 2012 WL 4892635, *6 (D. Vt. 2012) ("the ALJ was not obligated to afford significant weight to [the doctor's] conclusory opinion that [claimant's] impairments limited 'her ability to hold a full-time job'").

   In any event, Miller's contention that the ALJ failed to provide good reasons for rejecting Doyle's statement that Miller could work part-time lacks merit.  An ALJ should consider "all medical opinions received regarding the claimant."  *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)).  In evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

   (1) the frequency of examination and length, nature, and extent of the treatment relationship,

   (2) the evidence in support of the physician's opinion,

   (3) the consistency of the opinion with the record as a whole,

   (4) whether the opinion is from a specialist, and

>           (5)   whatever other factors tend to support or contradict the
>                 opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House*

*v. Astrue*, 2013 WL 422058, *2 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

The Social Security regulations provide that "[m]edical opinions are statements from physicians

and psychologists or other *acceptable medical sources* that reflect judgments about the nature

and severity of . . . impairment(s)." *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995) (quoting 20

C.F.R. § 404.1527(a)(2)). Nurse practitioners, by contrast, are listed in a separate section under

"other sources" whose "opinions may be considered with respect to the severity of the claimant's

impairment and ability to work." *Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) (citing

20 C.F.R. § 416.913(d)(1)). Although opinions from nurse practitioners are not considered

"acceptable medical sources," such opinions are nevertheless "important and should be evaluated

on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL

2329939, *3 (2006).

>           In his decision, the ALJ specifically considered the treating relationship between

Doyle and Miller and accorded Doyle's statement "significant weight."[4] (Tr. 27). The ALJ

concluded, however, that there was insufficient support in the record for the opinion that the

claimant was limited only to part-time work. (*Id.*). I agree. Moreover, Miller herself has not

---

[4] Miller also contends that the ALJ improperly gave significant weight to Grable, but cited to a treatment note provided by Doyle. Specifically, the ALJ stated that he gave Grable significant weight because Grable "had examined the claimant various times over a long period." (Tr. 27). I agree that the treatment note was authored by Doyle, not Grable, although the note indicates that it was provided to Grable. (Tr. 650). I conclude the error by the ALJ was harmless because the ALJ gave significant weight to Doyle based upon her treating relationship with Miller. (Tr. 27).

marshaled any evidence in the record supporting Doyle's conclusion.  Indeed, Miller would

likely be hard-pressed to do so considering that she testified that she attended school

approximately thirty-two hours a week without difficulty and that the only accommodations she

needed were breaks every three hours.  Simply stated, the ALJ correctly concluded that there is

nothing in the record to support the part-time limitation imposed by Doyle.

Moreover, I conclude that the ALJ's RFC assessment was supported by

substantial evidence.  Although Miller has required treatment for her diabetes, the record

supports the ALJ's conclusion that her diabetes did not present any physical limitations to her

ability to work as long as she was provided the opportunity to monitor and manage her blood

glucose levels every three hours.  Specifically, both Doyle and Miller indicated that Miller

needed to monitor her blood glucose level every three hours, and the ALJ incorporated this

limitation into his RFC assessment.  A physical examination by Toor did not reveal any other

physical limitations other than the need to avoid exposure to respiratory irritants, a limitation

accounted for in the ALJ's RFC assessment.  During the hearing, Miller testified to vision

problems.  Although the record did not contain any medical evidence to support Miller's

testimony, the ALJ accommodated Miller's blurred vision in his RFC assessment.

With respect to Miller's mental impairments, the record demonstrates that Miller

sought mental health treatment for several years and was improving with treatment and

medication.  Miller discontinued treatment when she became pregnant and had not returned to

treatment at the time of the hearing.  Miller testified that she suffered from stress and anxiety,

causing crying spells and outbursts, and that she did not work well around other people.  Miller

testified that she nonetheless was able to attend school approximately thirty-two hours a week.

Ransom's evaluation demonstrated that Miller's attention, concentration and memory were

intact.  The ALJ accounted for Miller's mental impairments in his RFC assessment by limiting

her to simple, unskilled work with sustained concentration for only up to two hours at a time and

with limited contact with coworkers, supervisors and the public.  In sum, although Miller

contends that the ALJ committed countless errors in his analysis, Miller has failed to identify a

single limitation (physical or mental) that the ALJ overlooked or failed to account for in his RFC

assessment.  To the contrary, the ALJ properly reviewed the medical records and opinions and

Miller's testimony concerning her abilities and formulated an RFC based upon her limitations.

The ALJ's RFC assessment was reasonable and supported by substantial evidence.  *Pellam v.*

*Astrue*, 508 F. App'x 87, 90-91 (2d Cir. 2013).

      **C.**    <u>**Miller's Remaining Challenges**</u>

      Miller also challenges the ALJ's RFC assessment on the grounds that he

improperly relied on the opinions provided by the state agency examining and non-examining

physicians, failed to account for the moderate limitations that he assessed at step three, and failed

to develop the record.  (Docket ## 11-1 at 19-27, 13 at 1-6).  Miller also challenges the ALJ's

credibility assessment and his step five assessment.  (Docket ## 11-1 at 27-30, 13 at 7-9).  Based

on the review of the record and applicable caselaw, I determine that these remaining contentions

are likewise without merit.  *See, e.g.*, *Ross v. Colvin*, 2015 WL 1189559, *12 (W.D.N.Y. 2015)

("a conclusion that a claimant suffered from moderate impairments at steps two or three is not

necessarily inconsistent with a conclusion that a claimant is not disabled") (citing *McIntyre v.*

*Colvin*, 758 F.3d 146, 151 (2d Cir. 2014)); *Fuentes v. Colvin*, 2015 WL 631969, *8 (W.D.N.Y.

2015) ("[t]he opinion of a consultative examiner can constitute substantial evidence supporting

an ALJ's decision") (quotation omitted); *Scitney v. Colvin*, 41 F. Supp. 3d 289, 305-06

(W.D.N.Y. 2014) ("[r]ead in context, however, this statement does not [necessarily] indicate that

the RFC assessment was a basis for a finding of lack of credibility") (internal quotations omitted) (alterations in original); *Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) ("the use of phrases such as 'moderate' or 'mild' by a consultative examiner does not automatically render the opinion impermissibly vague") (collecting cases); *Buscemi v. Colvin*, 2014 WL 4772567 at *19 ("[h]aving determined that substantial evidence supports the ALJ's RFC determination, [the challenge to the vocational expert's testimony] is rejected"); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 317-18 (W.D.N.Y. 2013) ("[a]lthough nothing in the record indicates that the ALJ attempted to obtain a functional assessment from [the treating physician], her failure to request such an assessment does not necessarily mandate remand[;] . . . [i]nstead, the relevant inquiry is whether, in the absence of the assessment, the record was sufficient to support the ALJ's RFC assessment") (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33-34 (2d Cir. 2013)); *F.S. v. Astrue*, 2012 WL 514944, *6 (N.D.N.Y. 2012) ("[a]n ALJ may rely upon the opinions of both examining and non-examining [s]tate agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability[;] . . . the regulations permit the opinions of nonexamining sources to override treating sources opinions provided they are supported by evidence in the record") (internal quotation omitted).

## <u>CONCLUSION</u>

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 12**) is **GRANTED**. Miller's motion for

judgment on the pleadings (**Docket # 11**) is **DENIED**, and Miller's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**


*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
           March 27, 2015